ISMAIL J. RAMSEY (CABN 189820)
United States Attorney
MICHELLE LO (NYRN 4325163)
Chief, Civil Division
SAVITH IYENGAR (CABN 268342)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36045
    San Francisco, California 94102
    Telephone: (415) 436-7200
    Facsimile: (415) 436-7234
    savith.iyengar@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA,<br><br>    Plaintiff,<br><br>  v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*,<br><br>    Defendants. | No. 3:23-cv-01795-JCS<br><br>**JOINT CASE MANAGEMENT STATEMENT** |

Plaintiff American Civil Liberties Union ("Plaintiff") and defendants United States Immigration and Customs Enforcement ("ICE") and United States Department of Homeland Security ("DHS") (collectively, "Defendants"), by and through their undersigned counsel, respectfully submit this joint case management conference ("CMC") statement pursuant to this Court's Civil Minute Order ("Order") dated July 17, 2023, which set a further CMC for September 1, 2023, and ordered the parties to submit an updated joint CMC statement by August 25, 2023.  ECF No. 27.

**I.    Factual Background**

On January 5, 2023, Plaintiff submitted a FOIA request ("Request") for documents related to the provision of COVID-19 antiviral drugs to people detained in immigration detention facilities. *See* ECF No. 26 at 2–4.  ICE and DHS acknowledged receipt of the Request on January 17, 2023 and February 10, 2023, respectively, and began working to respond to the Request thereafter. *Id.*  On April 13, 2023,

Plaintiff filed this lawsuit.  ECF No. 1.

## II.   Status of Search

As the parties previously shared with the Court, ICE has been working to respond to the Request, including by identifying appropriate components and tasking out subparts of the Request to those components, i.e., ICE Health Services Corps ("IHSC"), ICE's Office of Congressional Relations ("OCR"), and ICE's Office of Public Affairs ("OPA").  ICE also referred two subparts to DHS, which tasked those items to its Privacy component.  Thereafter, on June 30, 2023, Plaintiff sent ICE a list of proposed custodians, locations, and search terms, and on August 11, 2023, ICE provided Plaintiff with an estimated page count of potentially responsive records.

### A.   DHS

**Plaintiff's Position**

The parties are engaged in ongoing discussions concerning the sufficiency of DHS's search for relevant documents.

**Defendants' Position**

As Defendants shared with the Court at the parties' initial CMC, DHS completed its search and found no responsive records.  Defendants will be prepared to submit a declaration with any motion for summary judgment reflecting the adequacy of DHS's determination that it does not have responsive records.  In the meantime, and to avoid motion practice, Defendants are willing to meet and confer with Plaintiff to explain how DHS arrived at its determination.

### B.   ICE

Following the parties' initial CMC, this Court ordered ICE to "provide page counts no later than August 11, 2023," and ordered that "[a]fter the page count is created, the parties shall meet and confer on a future schedule."  ECF No. 27.

**Plaintiff's Position**

Defendant ICE provided Plaintiff with estimated page counts on August 11, 2023, as well as certain information concerning ICE's search efforts.  After reviewing that information, Plaintiff responded to ICE on August 18, 2023, with follow-up questions seeking to better understand ICE's search efforts.  ICE provided its responses on August 23, 2023.  While questions still remain concerning

the sufficiency of the search efforts, such as whether or not searches of specific programs, such as the IHSC Health Partner Order Portal, include all ICE facilities covered by Plaintiff's January 5, 2023 FOIA Requests, it would be more efficient and effective for ICE to begin reviewing and producing the documents they have already identified while the parties continue to discuss the sufficiency of ICE's search efforts. Beginning document review and production not only mitigates some of the prejudice Plaintiff suffers each day that passes without having access to documents it is entitled to under FOIA, but it also will allow for Plaintiff to further assess the sufficiency of ICE's search efforts by understanding what kinds of documents it has identified and not withheld from Plaintiff. With a better understanding of what the documents are that ICE has thus far collected, the parties will be able to have more productive discussions about the sufficiency of ICE's search efforts and will be able to resolve this matter sooner.

**Defendants' Position**

On August 11, 2023, ICE provided Plaintiff with estimated page counts. On August 18, 2023, Plaintiff sent follow up questions, which ICE answered on August 23, 2023. ICE has explained to Plaintiff as follows:

ICE has determined an estimated page count of 5,955 pages. This page count excludes Excel spreadsheets, which will be processed, but which typically generate an unhelpfully-lengthy page count when converted to PDF. This is an estimated page count given the way the agency's software ingests certain PDF files (e.g., it may miss certain pages). However, ICE believes the final page count (excluding Excel spreadsheets) is likely within approximately 40 pages of this estimate. The estimated page count is after de-duplication and threading.

ICE tasked the various subparts of the Request to IHSC, OCR, and OPA.

IHSC determined that any responsive records would be found in the following shared electronic databases: IHSC Policy Library, Health Partner Order Portal (which detention facility staff use to order COVID-19 vaccines and therapeutics), and Correctional Pharmacy Software (which allows ICE's pharmacists to monitor and track the inventory and dispensing of medications).

ICE tasked a Senior Health Policy Administrator, Health Policy Administrator, and two Regional Chief Pharmacists to conduct searches in these databases, which are national in scope. The Senior

Health Policy Administrator ran searches in the IHSC Policy Library using terms they had initially identified (through 3/24/23). After Plaintiff proposed additional terms, the Health Policy Administrator ran searches for all of Plaintiff's proposed terms (through 8/7/23). ICE's estimated page count reflects the results of these searches for all of Plaintiff's proposed terms.

Similarly, one of the Regional Chief Pharmacists conducted searches in the Health Partner Order Portal and Correctional Pharmacy Software using terms they initially identified (through 4/3/23). All IHSC facilities use the Health Partner Order Portal and Correctional Pharmacy Software. The Regional Chief Pharmacist also reviewed a share drive containing pharmaceutical invoice files for FY22 and FY23 and ICE's COVID treatment guidelines. While the Regional Chief Pharmacist determined that responsive records would likely be found in these shared databases and not emails given the nature of IHSC's operations, the Regional Chief Pharmacist's emails were also searched for the term "paxlovid." This term was chosen based on the Regional Chief Pharmacist's significant experience with the subject matter (i.e., which terms might return responsive records in an email search). After Plaintiff proposed additional terms, the second Regional Chief Pharmacist searched all of Plaintiff's terms in the Health Partner Order Portal and Correctional Pharmacy Software (through 7/27/23). The only term the Senior Health Policy Administrator had previously searched that was not on Plaintiff's later-submitted list of proposed terms appears to have been "COVID-19." ICE's estimated page count reflects the results of its searches for all of Plaintiff's terms and this additional term.

With respect to OCR, OCR determined that responsive records were likely to be maintained by its Acting Assistant Director and a Mission Support Specialist. Searches were conducted of their computers and emails, as well as OCR's Congressional Engagement & Liaison Outreach Tracking Tool. Searches were conducted before Plaintiff proposed search terms, but did not need to be re-run because they were reasonably focused on the records specifically mentioned in the Request and reasonably calculated to uncover all relevant documents. The search terms used for the Acting Assistant Director's computer and email were "antiviral," "antiviral drugs," "therapeutic," and "treatment" (through 6/6/23). The search terms used for the Mission Support Specialist's computer and email, and OCR's Congressional Engagement & Liaison Outreach Tracking Tool, were "antiviral," "antiviral drugs," and "therapeutic" (through 6/9/23).

Finally, OPA determined that the person most likely to have responsive records would be its Deputy Assistant Director/Press Secretary. Their emails were searched using all of Plaintiff's proposed terms (through 7/6/23). OPA also searched the records of the Deputy Press Secretary and two Public Affairs Specialists. These searches were run before Plaintiff proposed search terms, but did not need to be re-run given that they use terms or phrases reasonably focused on the records specifically mentioned in the request and reasonably calculated to uncover all relevant documents, and given that the Deputy Assistant Director/Press Secretary's records were searched using all of Plaintiff's terms. The Deputy Press Secretary's computer and emails were searched for the phrases "covid therapeutic" and "covid antiviral" (through 5/24/23). One Public Affairs Specialist's computer and emails were searched for (covid & therapeutic) and (covid & antiviral) (through 5/25/23), and the other Public Affairs Specialist's computer was searched for the phrases "covid 19 antiviral drugs" and "covid 19 therapeutic treatment" (through 5/25/23). These search terms were devised based on each Public Affairs Specialist's significant experience with the subject matter, i.e., the terms (and locations) each one believed were reasonably calculated to uncover relevant documents.

At the same time that ICE shared estimated page counts with Plaintiff on August 11, 2023, ICE noted that it had reasonably determined that responsive records were not likely to be found by searching the remaining custodians Plaintiff proposed. Accordingly, ICE noted that — as the Court instructed during the parties' initial CMC — if Plaintiff would still like any of those persons included, it should please share why it believed that person would have responsive records (and records that would not have been included already).

On August 18, 2023, Plaintiff explained that it "is amenable to leaving out some of the individual custodians we requested on the condition that Defendants include Dr. Martin Sanders, Chief of Public Health, Safety, and Preparedness Unit." On August 23, 2023, Defendants requested clarification about what Plaintiff meant by being "amenable to leaving out *some* of the individual custodians" if ICE includes Dr. Sanders (emphasis added), and asked whether, if ICE includes Dr. Sanders, Plaintiff would accept the reasonableness of the custodians ICE had selected. In finalizing this joint CMC statement on August 25, 2023, Plaintiff shared that its position is that, for the time being, Plaintiff is not requesting that ICE search any additional custodians beyond those ICE listed and Dr. Sanders, with the

understanding that Plaintiff is not waiving any argument about search adequacy.

## III.     Status of Production

**Plaintiff's Position**

Defendant ICE has already identified 5,955 pages of records that should be reviewed and produced except under limited circumstances as provided by FOIA. Given that Plaintiff sent its FOIA requests to ICE over 8 months ago and ICE has now failed to provide the documents required under FOIA for over 6 months, there is no reason production should be delayed further. And ICE has failed to articulate a reason for continuing to delay production.

ICE claims that if it begins to batch documents for review, "it will not be able to de-duplicate and thread any additional records it collects pursuant to the parties' meet and confer efforts." That, however, is not the case. No matter when ICE performs future document searches and collections, ICE (like any other party employing standard e-discovery practices) will be able to de-duplicate that new collection based on the prior collection. Whether some documents are reviewed and produced does not change that reality.

Threading is only relevant for email communications; however, it currently appears that further email threading will not reduce the set of documents for ICE to process at all—and certainly will not significantly reduce that set. ICE has taken the position that emails are generally not responsive to Plaintiff's requests. ICE has informed Plaintiff that "the Regional Chief Pharmacist determined that responsive records would likely be found in [ICE's] shared databases and not emails given the nature of IHSC's operations" and that, in some instances, emails of ICE employees were not even searched because it was determined by those employees that searching emails would not be "reasonably calculated to uncover relevant documents." Plaintiff has already provided ICE with its position on email production: that ICE should add a single email custodian for purposes of this initial collection and production. ICE has more than enough time to collect that custodian's emails, conduct threading, and then begin production. It therefore appears at the present that there will be no need to collect further emails after ICE has already conducted threading. To the extent emails are later, unexpectedly collected and "reviewers could be forced to review multiple copies of the same records," it would limited to emails that were not threaded, and ICE has not demonstrated that it would implicate many emails. Any

burden imposed by reviewing an extra few emails does not outweigh the harm inflicted to Plaintiff with ICE's continued violation of Plaintiff's rights under FOIA.

ICE also raises concerns with setting a production schedule and rate because it "cannot reliably predict the number of pages it will be able to release with each production." However, the Court can remedy this supposed issue by ordering ICE to process—not produce—a set number of pages per month, which removes ICE's uncertainty about the number of documents from a review set that it will withhold.

Because Defendant ICE will not propose a date for beginning document productions or a production rate, Plaintiff requests that the Court orders Defendant ICE to begin producing documents on September 15, 2023, with subsequent productions every month. Plaintiff also requests that the Court order Defendant ICE to process no less than 2,000 documents each month from September 15 until all documents currently identified by ICE and not exempt under FOIA have been produced.

This production schedule and processing schedule find strong support in the case law. "[U]nreasonable delays in disclosing non-exempt documents violate the intent and purpose of the FOIA, and the courts have a duty to prevent these abuses." *Long v. IRS*, 693 F.2d 907, 910 (9th Cir. 1982). "A court therefore may use its equitable powers to require the agency to process documents according to a court-imposed timeline." *Clemente v. FBI*, 71 F. Supp. 3d 262, 269 (D.D.C. 2014); *see also Electronic Privacy Information Center v. DOJ*, 416 F. Supp. 2d 30, 38 (D.D.C. 2006) ("courts have the authority to impose concrete deadlines on agencies that delay the processing of requests meriting expedition").

A processing rate of 2,000 pages per month is well within reason. The documents Plaintiff seeks address Defendants' policies on the provision of COVID antivirals in ICE detention facilities—a matter of public importance and interest. *See*, *e.g.*, Nicholas Florko, *Prisons skimp on Covid treatments like Paxlovid, even as Biden plans to flood pharmacies with it*, STAT News (Mar. 8, 2022), https://www.statnews.com/2022/03/08/prisons-skimp-covid-treatments-paxlovid/ (analyzing the federal Bureau of Prisons' failures to provide Paxlovid); *Romero-Lorenzo v. Koehn*, No. CV2000901PHXDJHESW, 2023 WL 2924882, at *25 (D. Ariz. Mar. 30, 2023) (finding that the failure to provide COVID antivirals at a U.S. Marshals facility may violate the Constitution). To date, ICE has identified 5,955 pages of responsive documents. At a rate of 2,000 pages per month, ICE will complete its production of this initial set of documents in three months, at which point the parties can determine

with the benefit of this production what additional searches must be completed, thus permitting an efficient resolution of this case—hopefully without requiring the Court's intervention, but if necessary by summary judgment on any disputes that the parties cannot resolve.

A processing rate of 2,000 pages per month is well within the range of rates ordered by other courts. *See Open Society Justice Initiative v. CIA*, 399 F. Supp. 3d 161 (S.D.N.Y. 2019) (acknowledging agencies' "resource constraints and competing priorities," and ordering each defendant to process 5,000 pages per month in light of the significant public interest and time sensitivity in the information sought); *Seavey v. DOJ*, 266 F. Supp. 3d 241, 248 (D.D.C. 2017) (ordering agency to process "not less than 2,850 pages per month" and finding this pace "well within the range of what other courts have ordered"); *Clemente v. FBI*, 71 F. Supp. 3d 262, 269 (D.D.C. 2014) (ordering agency to process 5,000 pages per month); *Elec. Privacy Info. Ctr. v. FBI*, 933 F. Supp. 2d 42, 48-50 (D.D.C. 2013) (rejecting claim that "exceptionally large number of FOIA cases involving the agency currently in litigation" justified only processing 1,500 pages per month, and ordering significantly higher volume); *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*, 811 F. Supp. 2d 713, 731 (S.D.N.Y. 2011) (ordering ICE to fully respond to an outstanding FOIA request that required processing over 14,000 pages in one month); *Judicial Watch, Inc. v. Dep't of Energy*, 191 F. Supp. 2d 138, 140-41 (D.D.C. 2002) (ordering agencies to process over 6,000 pages within 60 days); *NRDC v. Dep't of Energy*, 191 F. Supp. 2d 41, 43 (D.D.C. 2002) (ordering agency to process 7,584 pages in under two months).

**Defendants' Position**

Plaintiff has asked ICE to begin producing documents to Plaintiff, and for the parties to "discuss the additional collection efforts . . . in parallel with this production." Plaintiff has asked ICE to provide a "proposed date for beginning document production and at what rate it will produce documents" to Plaintiff. As noted above, however, the parties have not yet resolved the issue of ICE's searches, including, importantly, whether ICE will need to collect, aggregate, de-duplicate and thread the records of an additional custodian against the 5,955 pages of records already collected. If ICE begins batching the current set of 5,955 pages records for review without resolving these issues, it will not be able to de-duplicate and thread any additional records it collects pursuant to the parties' meet and confer efforts.

As a result, reviewers could be forced to review multiple copies of the same records, which would be a waste of federal resources.

Given that the parties do not yet have an agreed-upon page count, Defendants would respectfully request that the Court set a further CMC and allow the parties to continue to meet and confer about ICE's searches and the estimated number of pages to be processed before ICE begins processing records. Defendants respectfully request that the Court set this further CMC for September 29, 2023, with the parties' updated joint CMC statement due on September 22, 2023.

Defendants also note that once ICE can begin processing records, and the parties have determined a processing schedule, ICE will be *processing* a certain number of pages — as opposed to *producing* that number — because some of the processed pages will be nonresponsive or exempt from disclosure, and ICE therefore cannot reliably predict the number of pages it will be able to release with each production.

Finally, Defendants respond to several of Plaintiff's contentions above. First, Plaintiff claims that "ICE has taken the position that emails are generally not responsive to Plaintiff's requests." Plaintiff misunderstands ICE's summary of its collection efforts, which were previously shared with Plaintiff by email and are reiterated above. While IHSC's Regional Chief Pharmacist determined that responsive records would likely be found in shared databases and not emails given the nature of IHSC's operations, the Regional Chief Pharmacist's emails were nonetheless searched for the term "paxlovid." OCR's searches also included the emails of its Acting Assistant Director and a Mission Support Specialist. Likewise, the emails of OPA's Deputy Assistant Director/Press Secretary were searched using all of Plaintiff's proposed terms.

Plaintiff is also mistaken that deduplication and threading is only relevant for emails. To the extent ICE agrees to include the additional email custodian Plaintiff requested (Dr. Sanders), any document collection could include both emails and documents (i.e., attachments to emails) that have already been collected and will need to be deduplicated and threaded against the 5,955 pages of records already collected. As noted above, to the extent reviewers begin processing records before this process is complete, they could be wasting federal resources by reviewing multiple copies of the same records.

Further, with respect to the additional custodian, Dr. Sanders, it is unreasonable for Plaintiff to

suggest that ICE should have already "collect[ed] that custodian's emails, conduct[ed] threading, and then [begun] production."  Plaintiff only requested that ICE add Dr. Sanders on August 18, 2023, and stated that Plaintiff would be "amenable to leaving out some of the individual custodians" if ICE did so.  Defendants promptly sought clarification as to whether, if ICE includes Dr. Sanders, Plaintiff would accept the reasonableness of the custodians ICE had selected.  Plaintiff responded during the course of finalizing this joint CMC statement on August 25, 2023, explaining its position that, for the time being, Plaintiff is not requesting that ICE search any additional custodians beyond those ICE listed and Dr. Sanders.  In light of this explanation, ICE will promptly consider including Dr. Sanders, including by following up with Dr. Sanders once he has returned to the office.  As Defendants have explained to Plaintiff, Dr. Sanders has been on leave since the time of Plaintiff's request to add him on August 18, 2023, and is expected to return to the office on August 28, 2023.  If Dr. Sanders is included, ICE will need time to collect, aggregate, de-duplicate and thread his records against the 5,955 pages of records already collected, and determine the total number of pages that will need to be processed in this case.

   Finally, ICE believes that it is premature for the Court to set a processing rate before the parties have determined a final estimated page count.  To the extent the Court considers a processing rate at this stage, ICE respectfully disagrees with Plaintiff's contention that 2,000 pages per month is reasonable, especially while collection efforts are still ongoing.  In Defendants' experience, parties have stipulated to (and courts in this district have approved) far more reasonable processing rates even where collection efforts have concluded, the documents involve few exemptions, and especially where — as here — an agency's FOIA workload is immense.  *See, e.g.*, *Swords to Plowshares v. U.S. Dep't of Veterans Affairs*, No. 3:20-cv-07146-JSC, ECF No. 31 (March 19, 2021) (setting review rate of 600 pages per month); *USRTK v. U.S. Dep't of Education*, No. 20-cv-09117-DMR (setting review rate of 750 pages per month); *see also ACLU of N. Cal. v. ICE*, No. 4:21-cv-02632-DMR, ECF No. 31 (October 13, 2021), Ex. A (reflecting ICE review rate of 500 pages per month in *ACLU of N. Cal. v. DHS*, No. 3:18-cv-04105-LB (N.D. Cal.)).

   Indeed, all of the cases Plaintiff cites for a higher processing rate involved "exceptional" and "unusual" factors not present here.  In setting a processing rate of 5,000 pages per month, the district court in *Open Society Justice Initiative v. CIA* explained that "a heightened commitment of resources is

warranted for this particular FOIA request" because it "concerns a matter of exceptional public importance and obvious and unusual time-sensitivity." 399 F. Supp. 3d 161, 167 (S.D.N.Y. 2019) (emphasizing the "paramount public importance and urgency" of the request). Further, each agency had identified over 300,000 pages of potentially responsive records, and that rate would allow the material to be reviewed in "just under five years." *Id.* at 166–68. This case, by contrast, does not involve an "exceptionally" important issue or "unusual time-sensitivity," and currently involves 98% fewer potentially responsive pages.

Likewise in *Seavey v. DOJ*, 266 F. Supp. 3d 241 (D.D.C. 2017) and *Electronic Privacy Information Center ("EPIC") v. FBI*, 933 F. Supp. 2d 42 (D.D.C. 2013), high total estimated page counts were central to the courts' analysis. In *Seavey*, the court set a processing rate of 2,850 pages per month to ensure that the FBI "complete[d] processing the request within three years of this decision." 266 F. Supp. 3d at 248. Given that 102,385 pages remaining to be processed, the FBI's proposal would have taken "17 years to complete the processing," far longer than the FBI's own "policy goal that 'no requestor should have to wait more than three years before the FBI provides a complete response' to a request." *Id.* In *EPIC*, the court set a processing rate for the FBI based on the fact the case involved 25,000 potentially responsive pages. 933 F. Supp. 2d at 50.

With respect to *National Day Laborer Organizing Network v. ICE*, 811 F. Supp. 2d 713 (S.D.N.Y. 2011), Plaintiff mistakenly claims that the court "order[ed] ICE to fully respond to an outstanding FOIA request that required processing over 14,000 pages in one month." In fact, the court ordered *five* federal defendants (ICE, DHS, FBI, Executive Office for Immigration Review, and Office of Legal Counsel) to process records plaintiff claimed were of urgent and immediate importance given ongoing "public confusion" about an opt-out provision — without setting a processing rate — and *four* of the five federal defendants collectively produced over 14,000 pages of opt-out records, not ICE alone. *Id.* at 731; *see also Nat'l Day Laborer Org. Network v. ICE*, No. 1:10-cv-03488-SAS, ECF Nos. 25, 33.

Plaintiff's remaining cases likewise involve unique circumstances on which the court based a higher processing rate, none of which are present here. In *Clemente v. FBI*, the district court found a processing rate of 5,000 pages reasonable in light of "the importance of [the requester's] work *and the possibility that she may have only a limited time in which to do it*" — i.e., because of her terminal

JOINT CASE MANAGEMENT STATEMENT
3:23-CV-01795-JCS                                  11

illness.  71 F. Supp. 3d 262, 265, 269 (D.D.C. 2014) (emphasis added) (faulting the FBI for "not address[ing] what, if any, impact Clemente's declining health should have on the Court's decision to stay her request").

In *Judicial Watch, Inc. v. Department of Energy*, seven federal agency defendants moved to dismiss plaintiff's FOIA action for failure to exhaust administrative remedies, arguing that plaintiff sued "seven days (excluding weekends) too early."  191 F. Supp. 2d 138, 139 (D.D.C. 2002).  In the ensuing ten months, most of those agencies fully responded to plaintiff's requests; for those that did not, the court set a high processing rate.  *Id.* at 141.

Finally, in *NRDC v. Department of Energy*, the request was made in April 2001, the Department made an initial release in May 2001 and completed its collection, but, as the court explained, "[i]t is very hard to discern . . . what in the world Department personnel were doing from July 2001 through December 2001" instead of reviewing the 7,584 pages of documents collected.  191 F. Supp. 2d 41, 43 (D.D.C. 2002).  As the court explained further: "What is even more distressing is that [p]laintiff was not the only requester seeking this information. . . . Thus, by processing [p]laintiff's request in a far more expeditious manner, as this Court will order, DOE will also be carrying out its FOIA responsibilities to the other 11 requesters."  *Id.*  For these reasons, and because "the material which [p]laintiff seeks is of extraordinary public interest," the court rejected the Department's request to have until May 15, 2002 to process the records, and required them to be processed by March 25, 2002.  *Id.*

Here, by contrast, Defendants have been working in good faith to respond to the Request since it was made.  Defendants identified appropriate custodians and tasked out subparts of the Request to those components.  As detailed above, ICE revised its searches after Plaintiff sent it a list of proposed custodians and search terms on June 30, 2023, conducted a comprehensive collection of potentially responsive documents, and timely shared an estimated page count of potentially responsive records with Plaintiff on August 11, 2023.  While ICE believes it is premature for the Court to set a processing rate before the parties have determined a final estimated page count, ICE respectfully submits that a rate consistent with the authorities Defendants have cited is reasonable given the facts of this case.

|   |   |   |   |
|---|---|---|---|
| | | | Respectfully submitted, |
| | | | ISMAIL J. RAMSEY<br>United States Attorney |
| Dated: August 25, 2023 | | By: | */s/ Savith Iyengar*<br>SAVITH IYENGAR<br>Assistant United States Attorney<br>Attorneys for Defendants |
| | | | GOODWIN PROCTER LLP |
| Dated: August 25, 2023 | | By: | **\*\****/s/ Oscar Barron-Guerra*<br>OSCAR BARRON-GUERRA<br>*OBarronGuerra@goodwinlaw.com* |
| | | By: | **\*\****/s/ Linnea P. Cipriano*<br>LINNEA P. CIPRIANO<br>*LCipriano@goodwinlaw.com* |
| | | | AMERICAN CIVIL LIBERTIES UNION FOUNDATION |
| | | By: | **\*\****/s/ Kyle Virgien*<br>KYLE VIRGIEN<br>*kvirgien@aclu.org*<br>EUNICE CHO<br>*echo@aclu.org* |
| | | | AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA |
| | | By: | **\*\****/s/ Sean Riordan*<br>SEAN RIORDAN<br>*sriordan@aclunc.org* |
| | | | Attorneys for Plaintiff |

\*\* Pursuant to Civ. L.R. 5-1(h)(3), the filer of the document has obtained approval from these signatories.